Good morning. It's the second day of our sitting. Judge King is participating from Houston and she'll be able to ask questions through the monitor. And to my left is Judge Duncan. And we'll go ahead and call the first case, 19-60001, Simmons v. Pacific Bells. Mr. Wade. May it please the Court. Your Honor, this is a case of interpretation of a Mississippi statute, which is Mississippi Code Annotated 13-535. The title of it is Influencing Jury Service Abordance Employment Rights. The relevant part of it is very clear. It states that the statute is intended to remove or otherwise subject an employee to adverse employment action as a result of jury service. And then the other relevant part, it has a criminal section, Section 3. Any violation of the above section shall be deemed an interference with the administration of justice and a contempt of court and punishable as such. The question presented is whether Mississippi recognizes a cause of action for violation of that statutory prohibition. That particular statutory prohibition has not been before the Mississippi Supreme Court, the court of appeals, or this Court. But is the question just that? And I will benefit from you teasing out Mississippi law, but it seemed to me that you had three theories, one, a private cause of action in the statute, second, a McCarn-based theory in terms of refusing to do an illegal act, and then third, a Swindoll argument that you have a claim under sort of wrongful discharge because the statute, that same statute, prohibits terminating. Are those three separate and discrete? Really, the — I don't know if I can articulate this very well, but really, the first claim is that we have a Swindoll claim, which Mississippi Supreme Court has said it already recognized in some other earlier cases. The Ghali case, it said it already recognized it when it came down there. And the second claim, we have a McCarn claim, which is that he was told a lie. That would violate the McCarn doctrine. That's the second claim.  Okay. Now, I mean, the Swindoll claim, it's a recent decision. It hasn't been applied much. That was in the gun possession context. Exactly right, John. Exactly right. So I need to just say two things about it. The statutes are very similar. If anything, the jury statute I just read to you has stronger language. It's a mandatory shell language. The language of the gun case is a employer — and I'm quoting this, it's 45955 — an employer may not establish, maintain, or enforce any policy or rule that has the effect of prohibiting a person from transporting or storing a firearm in a locked vehicle in any parking lot, et cetera. I suppose one distinction that they're pressing is that the gun — this statute has its own remedial mechanism, that the argument would be that your client should have gone back to the judge that presided over the trial and said, hold them in contempt. Yes, sir. And their interpretation is just the opposite of Mississippi law. In the Swindoll case, that interpretation is just the opposite. What the Swindoll case quoted, it quoted the Kelly case and earlier cases and said that we didn't recognize a cause of action in that case because there was no criminal sanction. The fact of a criminal sanction is not less reason to impose civil liability, it's more reason. So if you give a careful reading to Swindoll and its interpretation of the earlier case, Kelly, the fact of a criminal sanction indicates that the victim of the crime has a civil remedy. It doesn't indicate that there's no remedy or the only remedy is a criminal case. I don't know how much this has to do with it, but to me it would be absurd. It's not a single case where anybody's ever been prosecuted under that statute. Not a single case where anybody's ever been prosecuted would be very hard to prove. But this particular jury service, to me, here's the reason they're so similar, Your Honor. The right to keep and bear arms is at least subject to some debate. I think it's an intensive debate of what those statutes and constitutional provisions, how they should be read. Nobody really seriously questions the constitutional and statutory right to a jury trial. And to enforce that right following the Swindoll case is just, to me, it would be like if they came up here and argued that, well, this case is not about tomatoes, it's about oranges. One of them is about the constitutional right to keep and bear arms. The other one is about the right to serve on a jury. And they just emphasize that when we have a prohibition, when we have a prohibition provided in state statute and in both cases fortified by the state constitutions, the courts, and he does a lot of talk about you haven't shown any legislative intent. It says the courts imply remedy. And there's language in there that says they make that same argument in Swindoll. They say, well, the legislature hasn't provided a remedy in damages. And the Mississippi Supreme Court in Swindoll said, well, they missed the point. The judiciary created the employment at will doctrine, so we therefore have the authority to modify it. And we modify it by saying that if there's a statutory prohibition, then there's a cause of action for damages in order to enforce that remedy. So we believe Swindoll, Your Honor, is a controlling case. There's a lot of language in there that's just right down the line of this case. I won't abhor the Court and waste my time by going through it, but it's right down the line of this case. The facts are fairly discreet and understood as alleged, but could you tell me if there's any facts suggesting that Bangor, the decision-maker, knew that your client had refused to lie? No, sir. I think I'm going to concede that. There's nobody ever testified to that. There's no — if I have time, I might want to respond to that further. But I don't think that's necessary for this reason, Your Honor. Henderson testified, and I'll give you the page where she testifies to this, I hope, that she recommended the decision in her deposition on page 336. She said, I recommended it, I got on board with it. Now, after her deposition was taken, she didn't give a time of when she, quote, got on board with it. But then after her deposition, about two months after her deposition, they got an affidavit from her right before the summary judgment was filed and said, well, I made that recommendation before he went on jury service. So their position is, well, we have proved undisputably that Henderson, the store manager, didn't make the decision and that she didn't make the recommendation. Your Honor, our position is that the court should not accept as true her affidavit. First of all, it hadn't been cross-examined under the Burdine case that the U.S. Supreme Court, the court can— The jury might disbelieve it. The jury's entitled to disbelieve it because she'd be implicating herself in a criminal case if she said otherwise. And it's just very suspicious that she never came up with a time during her deposition. She comes up with a time on an affidavit that's filed to get around the summary judgment. So we believe there's a McCormick claim that Henderson influenced the decision. So we don't have to have—of course, there's no way for us to prove what went on between Henderson and Banger. You know, we weren't there. But— Is there—do you have in mind any Mississippi law about what we call the cat's paw theory? No, sir. You know what? I'm sorry to say I'm not really aware of any. I may be mistaken. I don't think there's any Mississippi cases on that. I noticed that cat's paw theory, though, Judge Scalia said that's the general common law, is what he was doing. But I think in the absence of anything else, I'd assume that it would be a substantial contributing cause that she recommended the decision. Another reason I wouldn't have to believe, Your Honor—and this gets into the facts, which are really not at issue here, but the counsel spent a lot of time talking about the facts as if this guy's a terrible employee because he's late so much. There's a couple of things I'd like to point out. They had 50-hour work weeks. So it was in the interest of the employer that they save on overtime. And the store manager testified that she had told him that. I'll give you a page cite to that. Page 322. I'm sorry, 322 is where the co-employee said we left early to save on overtime or to save labor. And Henderson said on page 336 that she would allow him to leave in her discretion to save time. That termination notice, if you look at the specifics of why they terminated, several times are not for being late, they're for leaving early. And she testified that we let them do that to save time. So one manager would come in and replace another manager. So I know it sounds terrible, this guy comes in an hour and a half late, but all the employees came in late, and they were just waiting on another, you know, a relief shift. The facts are not an issue, so I don't want to spend much time on this, but this guy is not the, you know, they're saying, well, he was just a terrible employee. Of course, his evidence was he'd never been written up for or counseled about him or told him that. He was told, in fact, to leave early to save on the overtime because a normal work week was 50 hours a week. So they're trying to rely on the facts of his being late, although that's not an issue. I understand it could, you know, have some influence. But so in summary, Your Honor, we think the controlling case is a swindle case, and a careful reading of that case is it's not distinguishable. We don't have any special rule for the NRA that this right only applies to gun rights. It's a general right. If there's a prohibition in the statute applying to the employer-employee relationship, the Mississippi Supreme Court will judicially infer a remedy in their interest. Thank you, Counsel. Thank you, Officer. You've saved time for rebuttal. Mr. Gallagher. Good morning, Your Honors. May it please the Court. To address your first question, Judge, about the nature of plaintiffs' claims in this case and the scope of them, I want to pause briefly on it because it's easy to conflate them just based on the case law. The elements of some of the discussion in Swindle suggest that maybe it's a public policy case, and it's not. It's a statutory interpretation case. So Mr. Simmons' first claim in this case is a statutory claim that he was terminated because he served on a jury. And his claim is that he has a private cause of action under the relevant statute, the Employment Jury Duty Statute. His second claim is a Mississippi public policy argument under Swindle. An extension of McCarn is what Mr. Simmons argues, and that is based on his claim that he was told to lie to avoid jury service and that he refused that suggestion by Ms. Henderson and was terminated as a result. So his first claim is that he was terminated because he served on a jury, and that's his claim under the statute. His second claim is that he was terminated because he refused a request to lie, and that's his public policy claim. Well, it seems to me certainly the emphasis today in argument, and in going back, I agree with your characterization that the statutory claims and the public policy are a little bit unclear, a little hard to disaggregate. Maybe that's just because Swindle is so recent. But as he articulated today, and I thought fairly presented in his complaint, the Swindle statutory claim is distinct from the argument that there's a private cause of action. And what he's pressing primarily is that Swindle just applies full-on the logic of Swindle. Mississippi says you can't fire someone for possessing a gun. Mississippi says you can't fire someone for being in a jury. Logic's identical. The distinction, and it's an important one, is that the statute that the Swindle court was interpreting, as you pointed out in one of your questions, did not have its own remedial provision. So the remedial provision under the statute at issue in this case provides that any violation of the section shall be deemed interference with the administration of justice and shall be punishable as such. The statute in question in Swindle dealt with, as Mr. Wade explained, an employer's prohibition of an employee storing or transporting a gun in a blocked vehicle or an employer premises. And there was no specific remedial provision in that statute. All that we had was ---- of action. But I don't see how it distinguishes Swindle, because the employee in both cases is fired and loses their job. So the one that had a gun gets to make a damages claim. This is out of a job. But your argument would be here, you only recourse is to protect the court through contempt, but you couldn't get damages? Correct. And the reason the reason is that there's a well-settled line of cases in Mississippi that says that mere violation of a statute or regulation does not in itself create a private cause of action. You have to have some legislative intent to create a private cause of action, or there is none. Well, it sounds like now, with all due respect, that you're conflating the two theories, because Judge Higginson was talking about the Swindle and not the implied private cause of action. So, well, let me ask it this way. So my understanding of Swindle is that there's at-will employment in Mississippi except for reasons independently declared legally impermissible by the Mississippi legislature. That's the language that Swindle uses. I guess that's from McCarn. And the court in Swindle looked at 45-5, whatever that number is, the gun statute, and basically said, look, the legislature made it impermissible legally for an employer to terminate an employee for keeping a gun in his car or thereabout. And so it found an exception to the at-will employment, allowing a lawsuit, essentially. So explain to me this. Why isn't this case very simple? We look at 13-535. We find that the legislature also made it legally impermissible for an employer to subject an employee to adverse employment action as a result of jury service. Why isn't this just a simple application of Swindle? What am I missing? The statute in Swindle did not provide a remedy. And the Swindle court ---- Right. But did the Swindle court make anything turn on that aspect of the particular statute? No. In fact, the purpose of the decision in Swindle, the court reviewed the statute and found a private cause of action based on the exclusionary language, which is a public or private employer shall not be liable in a civil action for damages resulting from or arising out of an occurrence involving the transportation storage possession. And so the court looked at that provision and they said it wouldn't be reasonable. It would completely render the prescriptive provision of the statute in that case meaningless if we didn't find a private cause of action. There was no other remedy in that case. So the court looked at it and they said, we find that there's a private cause of action here because there is no remedy. And the way that we read this limitation on liability, we read it to establish a private cause of action under this statute. So it did interpret the statute and found that the legislature intended for there to be a private cause of action based on the plain language of the statute. The statute that ---- But what's the remedy for Mr. Simmons, though? How does ---- but how does contempt get him anything for losing his job? Okay. So, for instance, had Mr. Simmons gone to the court, reported that he had been terminated as a result of his jury service, the court would have held a hearing, presumably found, held the court, the employer in contempt, held a hearing. If the court determined that Mr. Simmons had, in fact, been terminated as a result of his jury service, it could have, for instance, required reinstatement and the payment of back wages as a remedy. That is a civil contempt remedy that would have benefited Mr. Simmons. He would have been paid his back wages and put back to work, presumably much more quickly than pursuing a private cause of action. So he's not without a remedy here. Those ---- that civil contempt ---- But Mr. Simmons, you know, again, you know, he's ---- he works at this Taco Bell place. He's supposed to know that he's got to go back to the judge that he presided over? No. He retained counsel. I mean, when he retained counsel and this lawsuit was filed, they went and they read the statute. The statute says any violation of this section shall be deemed contempt of court. And therefore, they knew the remedy. So whether Mr. Simmons independently was able to discern the remedies irrelevant, he had counsel and made his decision. If it isn't persuasive to us that Swindoll doesn't sort of map on exactly, do you still contend that there's no disputed issue of fact on a Swindoll theory of wrongful discharge? Well, there's no disputed issue of fact in the district court's decision should be affirmed inasmuch as the undisputed testimony in the record is that Ms. Banger, the decision-maker, had made the decision to terminate Mr. Simmons prior to his jury service. So, yes, to the extent that she made that decision prior to his service on the jury or any alleged request or refusal that he lied to avoid jury service, there still is no dispute. So a reasonable juror could think that's pretext, right? If the reason that the company is saying they fired him was that he was tardy and they decided that way before, but they gave him no warning, and the allegation is other people were tardy, and he was tardy how many times, 27, but they never, ever did anything until after he returns from jury service, and then they're both standing there and he's fired? Timing is the only proof of pretext on the Swindle argument, and that's insufficient given Ms. Banger's undisputed testimony. But why is timing the only issue here? If Henderson had said to him, I'm not going to accommodate you at all, and he alleges that she even told him to lie, and she never indicated that tardiness was any flaw at all, and she then recommends that he be fired, and she's there when he's fired, and it all happens right when he returns from the Well, remember, the statutory claim is based on his jury service. The recommendation to terminate was made well in advance of his jury service, and the decision was made before he served on the jury. Well, that's the allegation of the two of them. Correct. And the only evidence to the contrary is timing. There's no evidence in the record that suggests any dispute with regard to the testimony of the decision-maker or Ms. Henderson who made the recommendation prior to the jury service. But his allegation is Henderson told him to perjure himself. Right, and that's an unrelated claim. That's a separate claim. Okay. It's a separate claim altogether. So Mr. Wade and his argument suggested that because Swindle authorized a private cause of action under a different statute with a different remedial provision, his argument essentially is that it abrogates the requirement under Mississippi law that the legislature create a private cause of action. And we know that not to be the case here. In fact, for five years, five consecutive years after the statute in question in this case was passed, the Mississippi legislature proposed amendments that would have expressly given Mr. Simmons a private cause of action. And on each of those occasions, those amendments were not passed. Now, Mr. Simmons argues that we shouldn't look to any of those amendments. They don't tell us anything. He says Mississippi law suggests that they're not an interpretive tool. They're not useful. They shouldn't be used. Primary point is that Mr. Simmons has not himself offered any affirmative evidence. He bears the burden of establishing legislative intent, and he has not himself offered any evidence of the legislature's intent to create a private cause of action under this statute. He argues with regard to his claim that we should disregard those prior failed amendments. He argues Mississippi Gaming Commission v. Imperial Palace, which was a case in which the court considered prior failed legislative amendments and ultimately determined that they didn't resolve the ambiguity in the statute and weren't useful. So in other words, they couldn't discern from the prior amendments that the legislator intended or not to create the remedy at issue in that case. The last bill that failed to amend it, giving it a private cause, was pre or post Swindle? Pre Swindle. All pre Swindle? All pre Swindle. Okay. So the Mississippi Supreme Court seems to have seen that there's a different wrongful discharge tort, and at that point Mississippi's legislature is not doing anything because there it is. Okay, but the court's holding in Swindle didn't go that far. It was limited to the facts of the case and interpretation of that. Just to that one gun possession. Absolutely. Except for the remedial argument. That seems a little strange to say, as he characterized it, this is just a special for the NRA. Well, its holding was limited to that particular statute and its interpretation of that statute. It looked at the statutory text, and it determined that there was a civil cause of action under that text. The fact that it protects a right reference in the Constitution is irrelevant. You still have to show that there was legislative intent. And what the court did in Swindle was it went back and it looked at the statute colloquially known as the Guns and Trunks Law. And it went back and it looked at the Guns and Trunks Law, and it said, based on the language of this limitation and the prescriptive provision, it would not make sense to interpret the statute not to have a cause of action. There's no other remedy here. In this case, there is an alternative remedy, as Your Honor pointed out. Now, with regard to the public policy claim, the key issue, and the only real issue here, is whether the decisionmaker had knowledge of the alleged request that Mr. Simmons lied to avoid jury duty or his refusal to do so. And Mr. Simmons has put forth no evidence whatsoever to suggest that there was any knowledge. And the cases talk about generalized versus specific discussions between the decisionmaker and others who may have had knowledge. And there are some other categories of types of evidence, one of which is the timing, of course. But Mr. Simmons has produced no evidence at all that Ms. Banger and Ms. Henderson, Ms. Henderson is the one with knowledge, had any discussion, specific, generalized, any discussion about the termination decision, about the circumstances underlying the termination, about Simmons' performance, no conversations whatsoever. In fact, their theory of the case is that because Ms. Henderson and Ms. Banger were both at the termination meeting and both signed the termination document, that a jury can infer from those facts alone, there's not any evidence that there was any discussion from those facts alone, that Ms. Banger had knowledge. And he cites a handful of cases, and I'll go through them very quickly because each is distinguishable and I think they bear some mention, as to how this Court has handled similar situations regarding decisionmaker knowledge. The first case is a case called Ellerbrook, which is cited in the briefing. And Mr. Simmons argues that Ellerbrook is not distinguishable. Well, in fact, it is distinguishable. The decisionmaker in Ellerbrook, it was a retaliation case, was shown to have agreed with another city employee. And during the course of an investigation, that it may be a good idea for the employer to engage an outside employment consultant to interview the employee. And so there was a discussion about the circumstances surrounding the alleged retaliation and the And the Court found on that basis that a jury could infer that the decisionmaker had knowledge. Similarly, in Robinson, a decisionmaker had met with attorneys in preparation for EEOC witness interviews. And those attorneys had attended interviews that involved the complainant and others. And the Court found, relying in part on those meetings with the attorneys, that it could be reasonable to infer, a jury could reasonably infer, that the decisionmaker had been told or had gained knowledge of the testimony of the plaintiff. The third case is Emcare. It's also distinguishable for the same reason. There's evidence of a specific conversation. In that case, there was evidence that the decisionmaker and another employee with evidence, I'm sorry, with knowledge, specifically discussed plaintiff's performance and termination before the termination decision. Each of those cases is distinguishable, at least because there was some specific conversation with the decisionmaker and somebody with knowledge of the protected activity. I say at least because in Robinson, there was also some evidence that the decisionmaker had changed his treatment of the plaintiff after having held it. So, in my understanding, the argument as to the illegal act exception that you're making now, is that there are no facts suggesting Henderson influenced Banger, or is your argument that Mississippi doesn't recognize the cat's paw theory in this context? Okay. So, and I want to keep the cat's paw theory and the argument that the employee decisionmaker did not have knowledge separate. So, on one hand, our argument is that the decisionmaker did not have any knowledge. There's no evidence whatsoever that the decisionmaker had knowledge. That he refused to lie. That he refused to lie. That's the public policy claim. The cat's paw theory is separate, and it's inapplicable here. The cat's paw theory is that Ms. Henderson somehow influenced the decision. I agree. There's no evidence of any influence whatsoever, but to the extent that they rely on Ms. Henderson's recommendation to Banger that she terminate his employment, it's undisputed that that recommendation was made prior to the jury service. And on that point, Mr. Wade argued that there was no testimony in the deposition, in Ms. Henderson's deposition, about the timing of that recommendation. They had the opportunity to depose her and to ask that question. They did not ask that question. I mean, excuse me. Simmons did reach out to get assistance from Banger. Banger knew about the summons, correct? Absolutely. Absolutely. There's no dispute that Banger was aware of the jury service at that point. The question, as it relates to the public policy claim, is did Banger know that he had been asked to lie or that he had refused to lie, and she had no knowledge of that whatsoever. In fact, Pellant misstates in his brief what our position is with regard to Ms. Banger's knowledge. Our position was that she did not know of any alleged request or refusal to lie, not that she didn't know of the jury service. But as your time runs out, do you accept that Mississippi would recognize a cat's paw theory of liability? Absolutely.  Absolutely. Thank you, Your Honor. Thank you, counsel. Your Honor, with respect to his argument about the significance of the remedial provision, I'd like to call Your Honor's attention to Swindle at page 849, and it's just a simple sentence. The Kelly court based its decision largely on the like of a statutory provision expressly making it a crime for an employer to discharge an employee for filing such a claim. In other words, it said in Kelly, we said the significance is if it made it a crime, then it would have been more likely that we would have found a cause of action. So it's just precisely the opposite, the fact that there's a statute making it a crime, or at least a contempt of court, has just the opposite effect. It indicates civil liability. It doesn't indicate non-liability, applying Swindle. He makes an argument. It's a very ingenious argument, Your Honor, but it's not what Swindle said. He says the fact there was an exception found in the statute means that they must have intended to create liability. Well, that's not what Swindle said. There's nothing in Swindle to that effect. In fact, Swindle says pretty much the opposite on paragraph 23 of the Swindle opinion. Here's what it said in that regard. We do not see any harmony in an interpretation finding that the legislature, on the one hand, specifically precluded employers from prohibiting firearms inside locked vehicles on their premises, but then, on the other hand, granted employers complete immunity from damages in violation of that prohibition. So, Your Honor, the statutory interpretation he's trying to give, it's an ingenious way to interpret it, but it's not the way the Mississippi Supreme Court interpreted the statute in Swindle. So Swindle will end up applying to more and more situations? Are there – have you looked through the code and are there a lot of prohibitions on employment that then, by the logic of Swindle, would mean the at-will situation of Mississippi actually has a pretty substantial number of exceptions or is it narrow? Do you know? I mean, specific prohibitions against employers? Yes. Is it – Your Honor, frankly, this is the first time it's ever come up with me and I'm not able to answer that question whether there are other specific prohibitions against employers or not. I honestly don't. It doesn't seem like there's been that much litigation over Swindle. It hasn't really been developed in the courts. There are at least no appellate decisions so far as I can tell. Your Honor, this is the first time, but Your Honor just certified this question down to Swindle and Swindle just answered it. In fact, Swindle said, actually, Your Honor, I don't think Judge Southwick, who's now in this court, he was on the Mississippi – am I getting that right? No, he was on this court then, but he had been a Mississippi judge, but I don't think the Mississippi court was intending to criticize this court. But it said, actually, in Galley we'd already recognized that these prohibitions of federal and state law give rise to a cause of action. That's essentially what Swindle said. Counsel, Swindle was 2016. Do you know if there's been any legislative reaction to it in Mississippi? The legislature is saying, oh, well, we need to change some provisions? Not so far. I'm confident there hasn't been, but I can't say I've researched that, but I'm confident there hasn't been. Your Honor, his testimony, well, you've got to believe Henderson that the thing came before. I want to emphasize why I don't think the jury was, quote, required to believe in the words of Reeves, Henderson's testimony. First, when she's given her deposition, both lawyers are there. You know, you criticize either lawyer. Well, you didn't exactly ask about the timing. But then to come back after the deposition and submit an affidavit and say, and nearly a year later she submits an affidavit and says, actually it was after I made the recommendation before the jury service. There's no documentation, no e-mail, no writing. She just says that in an affidavit we can't cross-examine. Cross-examination is very important. And in the face of it, I'm sorry, Your Honor. No, you're nice. I mean, I guess he's saying all there is to implicate Banger is timing. That's it. I mean, to implicate. I'm not trying to implicate Banger. I know. I was shifting because I understand your argument. But would you say if it is limited to Banger as the decision-maker, the only thing that you've pointed to is the timing, or is there anything else that points to Banger's knowledge that he refused to purge? No, sir. What I'm arguing, I'm not arguing. That's our weakest argument about that Banger had knowledge, frankly. I came close to abandoning it, but that's our weakest argument. But our argument is that Henderson influenced the decision. Yeah. And if I just heard him say right, he doesn't deny the cat paw analysis applies. Yeah. And there's plenty of discredit. Henderson, she couldn't afford to come in there and say, well, I was committing a crime as soon as he took off on jury duty, and I told him I had to have him. She gave a specific reason. I had to have him for that shift. We had to have all four managers, and I had to have him. So I told him to lie. I mean, she didn't say I told him to lie, but she said he was. I'm sorry. I believe this is his testimony, that her rationale was that I got to have you for the shift and therefore lie to get out of my time, Judge. Thank you. Thank you. Thank you, Your Honor. Thank you both.